UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, et al., | |
| Plaintiffs, | CASE NO. C04-1291JLR |
| v. | ORDER |
| RED ROBIN GOURMET BURGERS, INC., | |
| Defendant. | |

## I. INTRODUCTION

This matter comes before the court on Defendant's Motion for Summary Judgment (Dkt. # 54).  Having read the papers filed in support of and opposition to this motion, the court DENIES Defendant's motion.

## II. BACKGROUND

Plaintiffs Equal Employment Opportunity Commission and Edward Rangel (collectively "Plaintiffs") filed suit against Rangel's former employer, Defendant Red Robin Gourmet Burgers, Inc. ("Red Robin"), alleging religious discrimination in violation of Title VII of the Civil Rights Act of 1964.  Red Robin terminated Rangel when he refused to cover his tattoos, allegedly obtained for religious reasons, in violation of Red

ORDER – 1

Robin's dress code policy. Defendant now moves for summary judgment on Rangel's claims.

Rangel practices Kemetecism, a religion with roots in ancient Egypt, or "Kemet."[1] With an interest in joining the priesthood, Rangel obtained two tattoos, encircling his wrists, which are less than a quarter-inch wide. Written in Coptic, the tattoos translated in English state, "My Father Ra is Lord. I am the son who exists of his Father; I am the Father who exists of his son." Rangel Decl., Exh. A. Rangel received the tattoos during a religious ceremony after undergoing a rite of passage involving communal prayer, meditation, and ritual. The tattoos allegedly represent his servitude to Ra, the Egyptian god of the sun, and his commitment to his faith. Rangel believes that intentionally covering them is a sin, while incidentally covering them, such as when wearing a long-sleeve shirt or gloves, is not a sin. For Rangel, the key difference is whether he intends to cover them, which only happened during the month of Mesura, when Rangel believes Ra died and was reborn. According to Rangel, binding his wrists (and thereby covering his tattoos) represents his grief and servitude to Ra.

Rangel began working in December 2001 for Red Robin's Bellevue, Washington location as a server. Upon being hired, Rangel signed Red Robin's "Uniform/ Appearance" policy which provides in part, "[b]ody piercings and tattoos must not be visible." Johnston Decl., Exh. 7. Rangel, as well as other servers, worked at the Bellevue location with their tattoos uncovered until May 2002 when the assistant manager, Brad Holmes, told him to cover his tattoos. Rangel alleges that he explained the religious significance of his tattoos to Holmes who "basically said, 'Okay, cool,'" and allowed him to continue working with the tattoos uncovered. Healy Decl., Exh. A at 93.

---

[1] Rangel affiliates himself with the Anu tribe, numbering less than 10 members.

ORDER – 2

In June 2002, Rangel attended an orientation for Red Robin's new restaurant location in Bellevue. During the orientation, Red Robin's general manager and senior regional operations director approached Rangel about his tattoos, telling him to cover them. According to Holly Hogan, one of the managers, Rangel gave a "lengthy explanation" about his faith, his reasons for having the tattoos, and his belief against covering them. Id., Exh. B at 19-20. Although Hogan and the other manager, Stephanie DeFrancisco, suggested Rangel could cover the tattoos with wrist bands or bracelets (contrary to Red Robin policy which limits jewelry to two rings and earrings), Rangel refused and was escorted out.[2] When Rangel returned for his second scheduled shift at the new location, Hogan and DeFrancisco asked him again to cover his tattoos and he refused. After Hogan and DeFrancisco presented him with the option of covering his tattoos and working, or leaving them uncovered and going home, Rangel maintained his refusal to cover them and DeFrancisco escorted him out. Rangel immediately called DeFrancesco's supervisor, Ernie Sapiro, who looked into the matter and upheld the managers' decision. Red Robin officially terminated Rangel on June 17, 2002.

### III.   DISCUSSION

**A.   Legal Standard**

Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its

---

[2] Although the parties dispute the exact words exchanged at this meeting (the managers allege Rangel yelled and called them racist, which he denies), the parties agree that Rangel explained the religious significance of his tattoos and refused to cover them. For purposes of this motion, the parties' specific statements are non-material issues of fact.

ORDER – 3

motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial responsibility, the burden shifts to the non-moving party to establish that a genuine issue as to any material fact exists. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Evidence submitted by a party opposing summary judgment is presumed valid, and all reasonable inferences that may be drawn from that evidence must be drawn in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The non-moving party cannot simply rest on its allegation without any significant probative evidence tending to support the complaint. See U.A. Local 343 v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1995). "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322-23.

**B.     Religious Discrimination**

Title VII prohibits employers from discharging an employee based on the individual's "religion." 42 U.S.C. § 2000e-2(a)(1). Broadly defined, "religion" includes "all aspects of religious observances and practice, as well as belief" unless the employer demonstrates it is unable to reasonably accommodate an employee's religious observance or practice without "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). The Ninth Circuit applies a two-part framework to analyze Title VII religious discrimination claims.[3]  First, the employee must establish a prima facie case by

---

[3] The majority of Title VII religious discrimination claims proceed under this two-part framework as "failure to accommodate" claims, although employees may also bring religious

ORDER – 4

demonstrating (1) a bona fide religious belief or practice which conflicted with the employee's job duty, (2) notice to the employer of the belief and conflict, and (3) the employer threatened or discharged the employee based on the employee's inability to perform the job requirement. E.g., Tiano v. Dillard Dep't Stores, Inc., 139 F.3d 679, 681 (9th Cir. 1998). Second, if the employee proves that a prima facie case of discrimination exists, the burden shifts to the employer to show that it "initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." Id.

### 1.  Prima Facie Case

It is undisputed that Rangel notified Red Robin of the conflict between his religious belief and its dress code policy, and that Red Robin discharged him based on his violation of the policy, thereby establishing the second and third elements of a prima facie case. The parties strongly dispute, however, whether Rangel possesses a bona fide religious belief against intentionally covering the tattooed name of Ra (his Creator) on his wrists. Red Robin argues that Rangel's tattoos lack historical and textual support, and that Rangel's belief is both "inconsistent and arbitrary" in application, focusing on Rangel's practice of covering his tattoos during Mesura (when Ra allegedly died and was reborn), when he is cold, and while wearing long-sleeve clothing and costumes. Def.'s

---

discrimination claims under a disparate treatment theory, applying the traditional Title VII analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). E.g., Bodett v. Coxcom, Inc., 366 F.3d 736, 742-43 (9th Cir. 2004). Here, Plaintiffs appear to allege both theories of religious discrimination: (1) failure to accommodate, and (2) disparate treatment, and Red Robin seeks dismissal of both claims. Pl. Intervenor Compl. at ¶¶ 5.3, 5.4; Def.'s Mot. at 2. Yet Red Robin focuses its motion for summary judgment entirely on the Ninth Circuit's two-part framework for "failure to accommodate" claims and neither party attempts to apply the McDonnell Douglas framework. Consequently, the court limits its analysis to Plaintiffs' failure to accommodate claim and makes no ruling on Plaintiffs' disparate treatment claim.

ORDER – 5

Mot. at 17. In response, Plaintiffs distinguish Rangel's belief against intentionally covering his tattoos, which they call "sacrilegious concealment," from "incidental covering" that occurs while wearing a long-sleeve shirt or gloves. Pls.' Opp'n at 4. Further, Plaintiffs explain that Rangel covers his tattoos during Mesura as a sign of his grief and servitude to Ra. Id.; Healy Decl., Exh. A at 58. Viewing the evidence in the light most favorable to Plaintiffs as the court must on summary judgment, the court finds that Rangel has brought forth sufficient evidence to demonstrate that he possessed a bona fide religious belief, and thereby established a prima facie case of religious discrimination for failure to accommodate.

      Red Robin's first argument, that "sincerity is a *threshold issue* that must be resolved in every religious discrimination case," relying on United States v. Seeger, 380 U.S. 163 (1965), misstates the law. Def.'s Mot. at 10. In Seeger, the Supreme Court considered the claims of conscientious objectors seeking to avoid military service. Id. at 164. Although the Court held that "the threshold question of sincerity . . . must be resolved in every case," it specifically limited this holding in the next sentence (which Red Robin omits) to "every claim for exemption as a conscientious objector." Id. at 185. Contrary to Red Robin's suggestion, the Court did not indicate that sincerity is a threshold issue arising in every religious discrimination case, nor did it mention Title VII which Congress had enacted only one year prior.[4]

---

[4] The court also rejects Red Robin's invitation to evaluate the sincerity of Rangel's belief by importing the framework employed by the Second Circuit in Int'l Soc'y for Krishna Consciousness, Inc. v. Barber, 650 F.2d 430 (2d Cir. 1981). Bound by Ninth Circuit law, the court will not consider the size and history of Rangel's religion, or the centrality of his religious practice to his faith. See Heller, 8 F.3d at 1438 (cautioning that "Title VII protects more than . . . practices specifically mandated by an employee's religion," and counseling courts against determining "what are the tenets of a particular religion" as "irreconcilable" with Supreme Court precedent) (citing Fowler v. Rhode Island, 345 U.S. 67, 70 (1953) ("it is no business of courts to say . . . what is a religious practice or activity")).

ORDER – 6

While Red Robin characterizes Rangel's religious belief as an unprotected "personal preference," similar to that expressed by the plaintiff in Tiano v. Dillard Dep't Stores, Inc., 139 F.3d 679 (9th Cir. 1998), the court finds this comparison unavailing.[5] In Tiano, the Ninth Circuit held that an employee's alleged religious belief that she attend a specific pilgrimage during a certain time frame, was a "personal preference" because she offered one "lone unilateral statement" in support of her belief, without any further corroborating testimony of her own, and despite a record "replete" with contradictory evidence. 139 F.3d at 682. This evidence included Tiano's failure to complain about the alleged discrimination until after she learned that her plane ticket was non-refundable and her friend's testimony that they both decided to go on the pilgrimage after they "talked about it" and "thought it would be interesting to go on." Id. at 683. In light of this evidence, the Ninth Circuit held that Tiano's professed belief was "hardly a religious calling" and dismissed her case for failure to establish the first element of a prima facie case.

Turning to the facts of this case, the court finds that Rangel, unlike Tiano, offered multiple statements in his deposition about his faith, how he received his tattoos, and his belief that intentionally covering his tattoos amounts to sacrilege. Healy Decl., Exh. A at 48-49 ("to cover up or cross out the name of a god is – is basically a sin, because . . . it's a way of forgetting someone or wiping them out of existence."). Rangel explained that he based his belief on both scripture and Egyptian history. Further, he answered repeated questions about his reasons for covering his tattoos during Mesura and the distinction that

---

[5] Red Robin's suggestion that the Ninth Circuit "agreed with Seeger" in Tiano v. Dillard Dep't Stores, Inc., 139 F.3d 679 (9th Cir. 1998), arguably stretches the law given that the Ninth Circuit makes no reference to Seeger in its decision.

ORDER – 7

exists for him between incidentally and intentionally covering his tattoos.[6] The contradictory evidence before the court in Tiano, suggesting a financial motive and failing to corroborate plaintiff's belief, is absent here. Rangel's deposition testimony, along with his decision to sacrifice his job rather than cover his tattoos, is sufficient to demonstrate a bona fide religious belief. Heller, 8 F.3d at 1439 (finding either plaintiff's testimony about the significance of attending a religious conversion ceremony, or his decision to quit his job to attend the ceremony, sufficient to demonstrate a bona fide religious belief).

### 2. Undue Hardship

Having determined that Plaintiffs have successfully demonstrated a prima facie case of religious discrimination, the burden shifts to Red Robin to show that it made a good faith effort to reasonably accommodate Rangel, or that accommodating him would result in undue hardship. Tiano, 139 F.3d at 681. "When an employer does not propose an accommodation, or when its proposed accommodation does not eliminate the employee's religious conflict, the employer must accept the employee's proposal or demonstrate that the proposal would cause the employer undue hardship." Equal Employ. Oppor. Comm'n v. Townley Eng'g & Mfg. Co., 859 F.2d 610, 615 (9th Cir. 1988). Here, Rangel sought only one accommodation, an exemption from the dress code

---

[6]After repeated questioning by defense counsel about this distinction, Rangel likened being asked to conceal his tattoos to a Christian being asked to stop wearing a cross. Healy Decl., Exh. A at 66 ("It's an intention. If you are wearing a cross and you're Christian and you put a sweater on, you're still wearing a cross. But if someone tells you to rip that off, and you rip it off, then it's your intention to deface your own belief."). In the context of the First Amendment and the free exercise clause, the Supreme Court has cautioned that "[c]ourts should not undertake to dissect religious beliefs because the believer admits that he is 'struggling' with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." Thomas v. Review Bd. of the Ind. Employment Sec. Div., 450 U.S. 707, 715 (1981).

ORDER – 8

policy,[7] and Red Robin refused to provide it or offer any other alternatives. Thus, the court will focus its analysis on whether allowing Rangel to work with his tattoos uncovered constitutes an undue hardship.[8]

An accommodation that results in more than a *de minimis* cost to the employer, such as additional costs arising from lost efficiency or higher wages, constitutes an undue hardship. Balint v. Carson City, Nevada, 180 F.3d 1047, 1055 (9th Cir. 1999) (citing cases where courts have determined that undue hardship exists, including depriving co-workers of seniority rights and forcing co-workers to shoulder more than their share of potentially hazardous work). Employers must support a claim of undue hardship with proof of "actual imposition on coworkers or disruption of the work routine." Townley, 859 F.3d at 615 (quotation and citations omitted). Hypothetical hardships based on assumptions about the cost of a proposed accommodation are generally insufficient. Id.; Anderson v. Gen. Dynamics Convair Aerospace Div., 589 F.3d 397, 402 (9th Cir. 1978). "What constitutes undue hardship must be determined within the particular factual context of each case." Balint, 180 F.3d at 1054.

---

[7]Plaintiffs' suggestion for the first time in their opposition briefing that Red Robin could have accommodated Rangel by allowing him to wear a long-sleeve shirt is inconsistent with their prior admission that "the only workplace accommodation" Rangel considered reasonable was "allowing him to keep his wrist tattoos uncovered at all times while he worked." Johnston Supp. Decl., Exh. 13. The court will not consider this argument because "[e]vidence inconsistent with a Rule 36 admission is properly excluded." 999 v. C.I.T. Corp., 776 F.2d 866, 869-70 (9th Cir. 1985) (citing Fed. R. Civ. P. 36(b) Adv. Comm. Note (1970)).

[8]Plaintiffs' insistence that Red Robin "failed in its duty to engage in the interactive process" misstates the law. Pls.' Opp'n at 19. "If an employer can show that no accommodation was possible without undue hardship, it makes no sense to require that he engage in a futile act." Townley, 859 F.2d at 615 (citing Ansonia v. Bd. of Educ. v. Philbrook, 479 U.S. 60, 69 (1986)). Thus, Red Robin has no duty to show that it engaged in an interactive process because it contends that no reasonable accommodation existed which would have prevented undue hardship.

ORDER – 9

Here, Red Robin asserts that allowing Rangel to work with his tattoos visible would have resulted in undue hardship. As support for its position, Red Robin relies entirely on case authority from outside this circuit, focusing primarily on <u>Cloutier v. Costco Wholesale Corp.</u>, 390 F.3d 126 (1st Cir. 2004). In <u>Cloutier</u>, the First Circuit held that allowing the plaintiff, who belonged to the Church of Body Modification, to display multiple facial piercings, in contravention of Costco's dress code policy, constituted an undue hardship because "it would adversely affect the employer's public image." 390 F.3d at 136. The court based its decision on precedent from other courts upholding dress code policies in the face of Title VII religious discrimination challenges,[9] and the rationale that Costco possessed the discretion to adopt personal appearance standards to promote and protect its image. <u>Id.</u>, at 135-36.

While the court respects the well-reasoned decision of the First Circuit in <u>Cloutier</u>, it is guided by Ninth Circuit precedent providing that "undue hardship must be determined within the particular factual context of each case," <u>Balint</u>, 180 F.3d at 1054, and supported by "proof of actual imposition on coworkers or disruption of the work routine." <u>Townley</u>, 859 F.2d at 615 (internal quotation and citations omitted). Viewing the evidence in the light most favorable to Plaintiffs as the court must on summary judgment, the court finds that Plaintiffs have brought sufficient evidence to demonstrate that a genuine issue of fact exists regarding whether Rangel's proposed accommodation constituted undue hardship. Rangel worked for six months at Red Robin before being asked to cover his tattoos. There is no evidence in the record that any customers complained about his tattoos, or any other employee's tattoos, during this time. The

---

[9] The majority of decisions addressing this issue involve policies regulating facial hair. E.g., <u>Hussein v. The Waldorf-Astoria</u>, 134 F. Supp. 2d 591, 599 (S.D.N.Y. 2001); <u>Equal Oppor. Employ. Comm'n v. Sambo's of Georgia, Inc.</u>, 530 F. Supp. 86 (N. D. Ga. 1981).

ORDER – 10

small size of Rangel's tattoos (less than a quarter-inch) and the little-known language in which they are written (Coptic), suggest that few customers at the Bellevue location noticed or understood Rangel's tattoos, unlike the employee in Cloutier whose facial piercings were imminently visible.

Moreover, although Red Robin argues that it has presented "concrete evidence of undue hardship" by submitting a company profile and customer study suggesting that Red Robin seeks to present a family-oriented and kid-friendly image, Red Robin fails to present any evidence that visible tattoos are inconsistent with these goals generally, or that its customers specifically share this perception. Hypothetical hardships based on unproven assumptions typically fail to constitute undue hardship. E.g., Townley, 859 F.3d at 615 ("A claim of undue hardship cannot be supported by merely conceivable or hypothetical hardships") (quoting Tooley v. Martin-Marietta Corp., 648 F.2d 1239, 1243 (9th Cir. 1981)). Red Robin must provide evidence of "actual imposition on co-workers or disruption of the work routine" to demonstrate undue hardship. Id.

The court is unmoved by Red Robin's final, "slippery slope" argument that allowing Rangel to work with his tattoos uncovered would force it "to allow whatever tattoos, facial piercings or other displays of religious information an employee might claim, no matter how outlandish, simply because an employee claimed a religious exemption." Def.'s Mot. at 19. Determining whether an undue hardship exists depends on the facts of each case, and "the mere possibility that there would be an unfulfillable number of additional requests for similar accommodations by others cannot constitute undue hardship." Opuku-Boateng v. State of Calif., 95 F.3d 1468, 1474 (9th Cir. 1996) (reversing district court's finding that accommodating plaintiff's religious belief would lead to a rash of unfulfilled employee requests and hypothetical morale problems). Thus, the court finds that Red Robin has failed to bring forward sufficient evidence to

ORDER – 11

demonstrate that it is entitled to summary judgment on Rangel's failure to accommodate claim as a matter of law.

## C.     Back Pay and Front Pay Damages

In addition to seeking summary judgment on Plaintiffs' religious discrimination claims, Red Robin seeks to limit Plaintiffs' damages claim to the period of July 4, 2002 to March 5, 2003, based on Rangel's alleged failure to mitigate his damages. Plaintiffs do not oppose Red Robin's attempt to limit recovery of damages beyond March 5, 2003, given that it is undisputed that Rangel obtained full-time employment after that date. Plaintiffs, however, oppose Red Robin's attempt to limit Rangel's recovery from June 4, 2002 to July 3, 2002. To prevail on summary judgment, Red Robin must show that based on the undisputed facts in the record, "during the time in question there were substantially equivalent jobs available . . . *and* that [Rangel] failed to use reasonable diligence in seeking one." Equal Employ. Oppor. Comm'n v. Farmer Bros. Co., 31 F.3d 891, 906 (9th Cir. 1994) (citing Sias v. City Demonstration Agency, 588 F.2d 692, 696 (9th Cir. 1978)) (emphasis in original).

Failing to bring forward any evidence to demonstrate the first prong, Red Robin argues that the court should not require such evidence "where the Plaintiff utterly fails to seek substantially equivalent employment." Def.'s Mot. at 22. Red Robin, however, fails to provide any Ninth Circuit authority for this reformulation of the test.[10] Bound by Ninth Circuit precedent, the court will not eliminate Red Robin's burden of satisfying both prongs of the test, particularly when the record indicates that only a little over two

---

[10]When presented with this argument by an employer in another case, the Ninth Circuit acknowledged that "no Ninth Circuit authority for this purported exception to the general rule" exists and that it could "find none." Odima v. Westin Tucson Hotel, 53 F.3d 1484, 1497 (9th Cir. 1995). The court, however, found it unnecessary to resolve the issue because the employer failed to satisfy even the second prong of the test. Id.

ORDER – 12

weeks elapsed between Rangel's termination and his subsequent search for employment. Healy Decl., Exh. B at 46 (indicating Red Robin terminated Rangel on June 17, 2002). A jury could reasonably find that waiting two weeks to look for a new part-time position, while still employed in another position, does not constitute a lack of reasonable diligence. Thus, the court denies Red Robin's motion for summary judgment on this issue and will allow the Plaintiffs to present evidence of wage loss from Rangel's last day of work at Red Robin[11] to the date he obtained full-time employment on March 5, 2003.

**D.   Cross-Motions to Strike**

Both parties move to strike certain declarations in full, portions of other declarations, and exhibits attached to declarations. The court DENIES all of these motions given that each involves testimony or exhibits not relied on by the court in its decision, and notes that motions to strike are generally disfavored and should be filed sparingly.

---

[11]The court notes that a discrepancy exists in the record regarding this date. Although Red Robin argues that June 3, 2002 was Rangel's last day of work, its internal documents suggest that Rangel last worked on June 5, 2002 and that he was terminated on June 17, 2002. Healy Decl., Exh. B at 46. Thus, it is unclear from the record when Rangel's last day of work occurred and when he became aware of his termination.

ORDER – 13

## IV. CONCLUSION

For the reasons stated above, the court DENIES Defendant's Motion for Summary Judgment (Dkt. # 54).

Dated this 29th day of August, 2005.

JAMES L. ROBART
United States District Judge

ORDER – 14